## GILBERT JONES *v.* STATE OF MARYLAND

[No. 242, September Term, 1972.]

*Decided February 21, 1973.*

The cause was argued before THOMPSON, MOYLAN, CARTER and DAVIDSON, JJ.

*Chester Cohen* for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Rodney M. Watts, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court. MOYLAN, J., dissents and filed a dissenting opinion at page 135 *infra.*

Gilbert Jones, the appellant, was convicted in the Criminal Court of Baltimore of robbery with a deadly weapon and was sentenced to a term of 12 years. The sole question raised on appeal is whether the trial judge committed reversible error in denying his request to withdraw his waiver of a jury trial. In view of the contention it will be unnecessary to recite the facts of the crime. We will set out the dates of various occurrences in the court below because the time element is of significance in our decision.

On March 30, 1971, Jones was re-arraigned, entered a plea of not guilty and elected a jury trial. There was an agreement between counsel that the jury was to be selected that day but the actual trial was not to commence until April 5, 1971 because in the interim, the trial judge would be required to attend a conference of all of the judges of the State. The jury was selected, excused and left the court room. Jones requested and was granted permission to personally address the court. He advised he thought the jury selection process unfair because he had used up his 20 strikes before he understood that would be all that he would be permitted. He argued that although his counsel had told him he was limited to 20 strikes he did not fully understand what he was being told and he requested another panel of veniremen because "I want to strike another jury out of the characteristic

way that appears to be and by me challenging I never get a chance to get down to the ones I want to judge this case." The trial judge explained, "The law gives you the right as a Defendant to exercise twenty pre-emptory strikes, which you and your attorney used up. I can't give you under the law more strikes than that . . . I am bound by the law the same as you are."

On Monday, April 5, 1971 before the jury was sworn, the defendant requested that he be granted a court trial instead of a jury trial. The court thoroughly explained the procedure for the jury trial and explained that by giving up the jury trial that if he changed his mind again and wanted a jury trial later on, he would be unable to have a jury trial because he had waived his right. Thereafter a continuance was granted to permit counsel to interview and arrange for the summons of a prospective witness, Shirley Johnson. The case was reset for April 20. The record does not indicate why the case was not tried on April 20.

On May 20, 1971, the defendant appeared in court and requested that his counsel be dismissed claiming he was incompetent and proved to be negligent in selecting the jury in that he did not make Jones aware of the selection procedure and that he, Jones, had used up his twenty strikes before he was aware he was so limited. The trial judge stated that although he had found appellant's counsel to be a competent lawyer, he preferred that an accused have counsel with which he be satisfied and that he would permit trial counsel to withdraw. For the record, trial counsel stated as follows:

"In reference to what Mr. Jones just said about not advising him of his strikes at the time we were selecting the jury, I did advise. I want the record to indicate I did tell Mr. Jones he had twenty strikes, now don't use them all up at the time. Maybe Mr. Jones did not understand what I had said at the time and we proceeded to use those challenges rather freely. Also, I want to

indicate for the record I advised him in the middle of using these twenty strikes, we have, Mr. Jones, we only have a few more. I think I said, 'You have about half of your strikes already gone. Take it easy.' Maybe he didn't understand but I did advise him he had twenty strikes."

The Court: "Are you saying Mr. Jones was exercising his own discretion in making strikes and not you?"

Mr. Nelson: "I'm saying that exactly. And if you recall, Mr. Jones was the one telling me who to challenge."

The Court: "The Court did note Mr. Jones was telling you whether to challenge or not challenge prospective jurors. Both of you were in animated discussion on each and every prospective juror."

The appearance of other trial counsel was entered by appointment of the court on July 15, 1971.

The case was called for trial before a second judge on December 6, 1971. At that time Jones requested that his case be tried before the jury but the trial judge called his attention to the fact that Jones had changed his mind after the jury had been selected and that in view of the previous trial judge's admonition that he would not be permitted to change his mind again, refused the request. Jones's new counsel claimed that Jones thought his challenges were unlimited and that the last eight jurors had been selected after he had run out of challenges. The trial judge had only a partial record of the prior proceedings before him. He asserted that this was a new argument not presented before the prior judge. He denied Jones's motion, at least in part, because "there's not a single word to that effect in this transcript."

It appears from the record that a jury was available on December 6, 1971 and neither the State nor the court

would have been inconvenienced if Jones had been permitted to withdraw his waiver of a jury trial made eight months prior. We note that due to the original trial judge's granting of the postponement, appellant would have been tried before a different jury anyway.

Maryland Rule 741,[1] as amended, makes clear that an accused has the right to elect whether his case shall be tried before a court or a jury. Our cases, *Staten v. State,* 13 Md. App. 425, 283 A. 2d 644; *Cole v. State,* 12 Md. App. 379, 277 A. 2d 248 and *Walter v. State,* 4 Md. App. 373, 243 A. 2d 626, hold that for good cause a previous election may be withdrawn up until the actual commencement of the trial unless there is a showing that the granting of the motion would unduly delay the trial or otherwise impede justice. There is nothing in the change of language in the rule which would affect the efficacy of those cases.

In the instant case the record shows that a jury was immediately available for trial on December 6, 1971. We think the trial judge abused his discretion in refusing to permit appellant to withdraw his prior election of a court trial. Although an accused obviously cannot be permitted to change his election as a dilatory tactic, we note that here, from the complete record, there was at least a modicum of doubt that the accused fully understood the

---

1. Md. Rule 741, effective September 1, 1971 and at the time of trial provided as follows:
"An accused may elect to be tried by jury or by the court. Such election shall be made by the accused in open court when first called upon to plead after he is represented by counsel of record or has waived counsel. If an accused elects to be tried by the court, the State may not elect a jury trial. The court may, in its discretion and for good cause shown, at any time prior to the trial permit the accused to change his election."
The rule in effect at the time of the original election was as follows:
"An accused may waive a jury trial and elect to be tried by the court. If an accused elects to be tried by the court the State may not elect a jury trial. An election to be tried by the court must be made before any evidence in the trial on the merits is taken unless otherwise provided by local rule of court."

method by which a jury was selected at the time he participated with his counsel in selection of the jury. We think it of significance that several months had elapsed since the accused had made his election for a court trial, that a different judge was presiding at the trial than at the time the original election was made and that different trial counsel had been provided in the interim. Under all of these circumstances we think the withdrawal of the election should have been permitted and that he should be granted his constitutional right to have his case tried before a jury.

The State argues that *State v. Gerardi*, 6 Conn. Cir. 218, 269 A. 2d 641, stands for the proposition that an accused cannot elect a jury trial, withdraw the election and repeat this at will so as to postpone the case indefinitely. In that case the accused had previously elected a jury trial; on the date of trial the accused withdrew his election but before evidence was received, he sought to change his election and have a jury trial. The judge refused to grant a jury trial and the case proceeded on the same day. We do not think the case is apposite here where there was a substantial time lapse between the election and the attempted withdrawal of that election, as well as a change in the trial judge and in defense counsel.

> *Judgment reversed.*
> *Case remanded for a new*
> *trial.*

*Moylan, J., dissenting:*

Respectfully, I dissent. I agree with the majority that the decision of Judge Liss as to whether to permit the appellant to withdraw his earlier election of trial by court and to strike what would be for him, in the total history of bringing this case to trial, a second jury was one of those decisions falling within the discretionary range allowed a trial judge in governing the conduct of the trial. There is no dispute as to the fundamental axiom that

when a judge is vested with discretion, his exercise of that discretion will not be the occasion for appellate reversal, unless he has abused his discretion. The majority feels that there was an abuse here. I feel strongly that there was not.

In approaching the problem, I have one preliminary quarrel not so much with the majority opinion, as with the state of the law generally. The nub of the problem is What is "abuse"? It is a first principle of intercollegiate debating that the terms of the debate proposition must be defined before debate may proceed. Upon that logic, I find it impossible to measure the conduct of a trial judge against a standard unless I have a clear notion of what that standard is. In Maryland and, indeed, nationwide, there is an incredible dearth of sound analysis (or of any analysis, for that matter) and even of clear definition of the test "abuse of discretion." The elusive character of the concept and the equivocal state of its law are well summarized in 5 Am.Jur.2d, *Appeal and Error*, § 774; "Determination of abuse":

> "The line between a proper, if unfortunate, exercise of judicial discretion and an abuse of that discretion is not readily definable and it may be that the term 'abuse of discretion' means no more than that the decision below fell outside the permissible limits as viewed by the appellate court or that the court on appeal is of the opinion that the trial court should have decided otherwise. There is clearly no hard and fast rule by which an abuse of discretion may be determined, since the matter greatly depends on the circumstances of the particular case. However, it has frequently been held that a decision as to a matter falling within the area of judicial discretion will not be lightly upset, and that a discretionary determination may be 'reviewed' only in the case of a 'gross,' 'clear,' 'plain,' 'palpable,' or 'manifest' abuse of discretion. But

exercise of discretion, not to amount to an abuse, must be legally sound; there must be an honest attempt by the court to do what is right and equitable under the circumstances and the law, without the dictates of whim or caprice, or the fancies of the court. The discretionary decision must not be arbitrary, unreasonable, or express a merely individual or personal view, and it must be directed toward a just result by the conscience and the reason of the judge. However, the term 'abuse of discretion' does not necessarily imply a bad motive, passion, prejudice, whim, or caprice."

Finding meaning in the very nature of the word "discretion" and from the volatile trial circumstances upon which discretionary judgment is imposed as a control, I interpret discretion as freedom to act within a range of acceptable alternatives. In the discretionary areas, we are dealing not with legal rulings, which are ultimately ascertainable as right or wrong, but rather with judgment calls, where confidence must be lodged in the man upon the field. All analogies are treacherous, but I find our standard in reviewing discretionary decisions to partake of much of the character of our "clearly erroneous" standard in reviewing judicial fact-finding. It would belie the words we use, were we to vest a judge with "discretion" and then to substitute our judgment for his own whenever we disagree with his exercise of that discretion. A judge may have exercised his discretion differently than we might have exercised it—he may have been, in our judgment, affirmatively wrong—and, yet, still not have "abused his discretion." In the case at bar, I believe Judge Liss to have been right. I could, however, well believe him to have been wrong and still feel that he did not abuse his discretion.

In my judgment, an exercise of discretion made maliciously, arbitrarily, whimsically or capriciously is abusive; an exercise of discretion made rationally with some

support in fact or permissible inference is not abusive. There is, by definition, latitude in which reasoned judgment may operate.

Judge Liss was operating in a discretionary area. He made a reasoned judgment. There were facts, and inferences drawable from those facts, which arguably supported that judgment. This, to me, dispels all notion of abuse of discretion. To hold otherwise is to give us a roving commission to substitute our judgment for that of the trial judge. It is not to rigidify language or law to find something ominously Orwellian in speaking nobly of "discretion" and then restricting its operation to the single alternative we think appropriate.

As I read Judge Liss's ruling, it is not remotely analogous to the rulings dealt with by us in *Cole v. State,* 12 Md. App. 379, 277 A. 2d 248 (1971), and *Staten v. State,* 13 Md. App. 425, 283 A. 2d 644 (1971). In both of those cases, the defendants had initially waived trial by jury and elected trial by court. Both later sought to withdraw the earlier waivers and to elect trial by jury. In both cases, we were faced with lower court rulings holding the defendants rigidly to the earlier election. In both cases, we held the rulings to have been arbitrary, an insistence upon sticking with the earlier election just because the earlier election had been made—an insistence upon the rule for the rule's sake. It was in that context that we considered such factors as 1) the ready availability of a jury panel and 2) the non-likelihood of an unreasonable delay as bearing upon the question of whether the trial judge abused his discretion.

Judge Liss's decision, on the other hand, had nothing whatsoever to do with the time factor or with the possibility of delay. In my judgment, Judge Liss's decision would have been the same if a jury had already been in the box champing at the bit for the trial to begin and if the insistence on the court trial had somehow involved a delay. Judge Liss had a reason for acting which transcended all questions of scheduling. He decided that the

appellant had deliberately discharged his first jury because he didn't like its composition. He decided that the appellant was not going to outflank the jury selection process by any deliberate device. He decided that the appellant would not be permitted to strike a second jury, to replace the one he did not like, an hour later, a day later, a month later, a year later or a decade later. A sincere belief that the appellant was consciously attempting to manipulate the system to discharge one jury and then to pick another in its place is certainly a sound and reasonable basis for stepping in and thwarting that effort. As a reason for action, that is not an abuse of discretion. Our question becomes one of whether the facts, the inferences drawable therefrom and the chronology of the case itself lend reasonable support to such a belief.

Judge Liss, first of all, had the benefit of being on the spot, observing demeanor, hearing inflections, catching the tone and flavor of a total behavior, strong reasons for affording his judgment great deference. Even from a cold record, however, it is clear that the appellant was a savvy and resourceful courtroom veteran, who was adept at manipulating the trial process to his own ends.

I will make reference to three matters which did not occur until the trial itself was in process. In making a determination upon the total record as to whether an injustice was done, however, they are of some indirect assistance. While they are but a pale substitute for the direct observations which Judge Liss was in a position to make, they do, nevertheless, give some flavor of the confrontation between the appellant and the orderly procedures of law. They are persuasive that in holding that this appellant knew full well what he was doing when he dismissed his first jury, Judge Liss was not dealing with some ingenue caught up in a process he did not understand.

The appellant was convicted of breaking and entering in 1964, of storehouse breaking in 1965, of narcotics pos-

session in 1968, and of narcotics possession again in 1970. He was on parole at the time when the present armed robbery occurred. He was no stranger to the trial process.

As the appellant was about to take the stand in his own defense, the following confrontation with the court occurred:

"THE COURT: Overruled. Very well, continue. Mr. Jones, please stand up.

MR. JONES: I affirm.

THE COURT: Stand up.

THE WITNESS: I said I affirm.

THE COURT: Are you going to stand up or do I have to get somebody to pick you up? I don't want to have any problems with you. Step down and stand up until the Clerk is finished. You can affirm.

MR. JONES: I can affirm sitting down or standing up.

THE COURT: Mr. Jones I decide whether you affirm sitting down or standing up. I'm asking you please, politely to step down until the Clerk is finished asking you for affirmation. Will you please do that?

MR. JONES: Is it absolutely necessary?

THE COURT: Yes it is necessary. Just face the Clerk and you can affirm after he asks you the questions."

The caginess of the appellant is well reflected in part of his cross-examination as to prior criminal record:

"Q. Your first narcotic conviction in 1968, was that for possession of heroin?

A. So called heroin.

THE COURT: What is so called heroin?

THE WITNESS: So called heroin, just like I'm a so called negro.

Q. What would you call it?

A. I don't know what it was actually because I'm not an analyst. If I had some right now I wouldn't know how to analyze it.

Q. You knew what you had in your possession, at least what you had gotten?

A. I know what they said.

Q. What were you going to do with it, were you just going to look at it?

A. I pleaded not guilty.

Q. All right."

This is but pale reflection of the demeanor Judge Liss was in a position to observe at first hand. With this partial insight into the nature of the appellant, we look now to his case.

The appellant first came on for trial in the Criminal Court of Baltimore, before Judge Albert L. Sklar, on March 30, 1971. He was represented by William Nelson, Esq. He elected trial by jury. A jury was selected. In the course of that selection, the appellant exercised all twenty of his peremptory challenges. After he had exhausted his peremptories, the State still had eight peremptories remaining, which it proceeded to use. After the jury had been selected, it was excused for five days, because of the Judicial Conference plus a weekend. After the jury had been excused, the appellant entered into the following exchange with the court:

"MR. JONES: I would like to say I don't think that jury selection was fair because that is not the jury of my choice. I did not have the proper understanding of the proceedings of picking a jury. I don't think it is fair and that is not the jury I want.

THE COURT: Why isn't it the jury you say you want?

MR. JONES: I don't think they will give me a justifiable verdict.

THE COURT: What is your reason for that? You were given the twenty strikes which the law allows a defendant in a felony case, a case of this kind where possible imprisonment might be in the penitentiary, and the State has ten strikes. You and your attorney exercised your twenty strikes.

MR. JONES: I didn't have an understanding of the twenty strikes. If I feel as though these people going to be judging me, I should have the right to choose the ones I want to choose.

THE COURT: You have the right to choose the ones you want, keeping in mind the strikes you are allowed by the law.

MR. JONES: I wasn't aware of that. My lawyer told me this but I wasn't aware what he was saying at the time.

THE COURT: Mr. Nelson is a competent attorney. He knows the law.

MR. JONES: Yes, but when he told me I had twenty strikes I didn't know what he was saying.

THE COURT: I don't know what you mean when you say you don't understand you have twenty strikes. Are you saying you want more strikes?

MR. JONES: I want to strike another jury out of the characteristic way that appears to be and by me challenging I never get a chance to get down to the ones I want to judge this case."

The court then adjourned until April 5, 1971. At that point, the appellant had given no indication that he wished a continuance. He had made no mention of a newly-discovered defense witness, whose whereabouts could not be ascertained.

When the trial reconvened on April 5, the appellant informed the court (1) that he wished a court trial in-

stead of a jury trial and (2) that he wished to postpone the case because of a newly-discovered witness. Judge Sklar questioned him at length about his waiver of the jury trial. The appellant revealed a full understanding of the rights he was giving up and showed an adamant determination to do so. That discussion concluded:

"THE COURT: Let me tell you one other thing, Mr. Jones. If you are waiving or giving up a jury trial, as you want to do, this case, as Mr. Nelson says, you want to have postponed because you want to get a witness summonsed, I want you to understand if you change your mind again and say you want a jury trial later on, you won't be able to get a jury trial because you have given up your right to a jury trial. Understand?

MR. JONES: Yes.

THE COURT: You can't change your mind and say you want a jury trial.

MR. JONES: Right. Another reason why I want a postponement.

THE COURT: Changing your mind again and saying you want a jury trial later on, you can't have a jury trial later because you have given up that right.

MR. JONES: I understand that."

The appellant was then permitted to change his mode of trial. He then requested a postponement because of a newly-discovered witness, who ostensibly "would be crucial, very important to our defense." The name of the witness was given as Shirley Johnson. The State objected to the postponement, claiming that it was a delaying tactic to avoid trial on that day. In perhaps an excess of caution, the court acquiesced in the request:

"THE COURT: It might be a delaying tactic, but if the Court is going to err in one respect it would rather do so and still give the Defen-

dant every reasonable opportunity of getting his defense in order. I do not think the case ought to be postponed more than a short time. When I say short time, it should be reset within two weeks. That ought to be sufficient time. Don't you think so, Mr. Jones?
MR. JONES: I think so."

The majority sees the long delay between the abortive trial of March 30-April 5, 1971, and the consummated trial of December 6, 1971, as somehow attenuating the responsibility of the appellant for having aborted the first jury. On the other hand, I perceive the guileful hand of the appellant consistently at work in first causing and in then protracting the delay. I find it significant that the appellant made no point about the missing Shirley Johnson either prior to or during the proceedings of March 30, during the time when the appellant might still have obtained a jury to his liking. Only after he had discharged the undesired first jury on April 5 and was faced with imminent trial by court, was the urgency of a postponement first pressed or even suggested by him. The sparse facts brought out at the trial about the missing Shirley Johnson reveal to me the utter guile of the appellant in obtaining the postponement in the first instance.

The appellant was identified by the victim as one of two perpetrators of an armed holdup of a gasoline station at approximately 9 p.m. on September 16, 1970. The appellant's defense was that he was home alone at the time of the robbery. He testified that no one was with him who could substantiate his story; that his mother regularly worked on evenings until midnight; that his teen-aged sister regularly "socialized" in the neighborhood until approximately 11 p.m. He could not recall the date of September 16 specifically but did recall that all through the month of September, he was off the street and home by 7 p.m. because of his recently-granted parole. The maximum role even suggested implicitly for

Shirley Johnson, "a girlfriend", is that she could some-how corroborate the appellant's story that he was home alone. Even assuming that she would have been able to lend some corroboration to his self-asserted alibi, no reason was ever advanced as to why the importance of her testimony was not anticipated at anytime between the appellant's arrest, or at least between the time of the appellant's presentment on November 30, 1970, and April 5, 1971. In the meantime, the appellant had been ar-raigned on January 13, 1971, had received the State's Answer to his Motion for Discovery and Inspection on February 4, 1971, and had started to proceed with his trial on March 30, 1971.

The question of whether Shirley Johnson could, in-deed, have provided any corroboration is enigmatic in the extreme and again reveals, to me, the shiftiness of the appellant. His direct version of his alibi went as fol-lows:

"Q. Do you know where you were that day, September 16th, 1970?

A. Yes, I was at Target City Youth Program.

Q. And you returned from the program around 5 o'clock and did not go out the entire evening?

A. Right.

Q. Was anyone home with you at the time?

A. No, sir.

Q. Is there any one that you know of that could confirm that you were at home on September 16th, 1970 around 9 P.M.? Are there any wit-nesses to that?

A. No one other than myself.

THE COURT: You mean nobody else was in the house the entire time?

A. Yes, I was the only one in there.

Q. Where was your mother?

A. My mother was working.

Q. What time does she get home?

A. She gets home around 12 o'clock at this time."

Defense counsel then sought to reconcile the appellant's testimony with his earlier claim that Shirley Johnson "would be crucial, very important to our defense." The appellant's response is, to me, a conscious masterpiece of ambiguity:

"Q. Who is Shirley Johnson?

A. Shirley Johnson was a so called girlfriend of mine.

Q. Well at your last trial you indicated that you wanted a postponement because Shirley Johnson was a witness?

A. I couldn't get in touch with her, I don't know nothing about her address.

Q. What would she testify if you would get in touch with her?

A. She'd testify that I was there.

Q. That you were where?

A. I was home.

Q. You just finished saying nobody else was at home with you, how could she testify to that?

A. How could she testify if she's not here?

Q. How could she testify if she was not there? You said nobody else was at home with you from the time you came home at 5 o'clock until your mother came home at 12?

A. Right.

Q. Is that correct?

A. That's what I said.

Q. How could Shirley Johnson testify that you didn't leave the house?

A. What I was really indicating is that I don't have no other witnesses here to bear witness that I was at home."

A review of the record makes clear to me that the reluctance of the appellant to sit down at the trial table motivated a deliberate strategy of delay on his part. On April 5, 1971, Judge Sklar granted him a postponement to obtain the missing Shirley Johnson. On April 26, 1971, he was back before Judge Sklar for trial. He again requested a postponement because he had not yet been able to contact the missing witness. He was again granted a postponement. When, on June 30, 1971, his first court-appointed attorney, William H. Nelson, Esq., petitioned the court to withdraw from the defense, he pointed out in that petition that at least two other postponements had been obtained at the request of the defendant. That petition read in part:

"2. That there were four (4) postponements of trial on the above Indictments before the Court and at the request of the Defendant.
3. That on the fifth (5th) trial date before Judge Albert L. Sklar the Defendant requested that your Petitioner be dismissed as his attorney. The Court so authorized your Petitioner to withdraw as counsel for said Defendant."

When the appellant was brought back before Judge Sklar on May 20, 1971, he apparently despaired of relying upon Shirley Johnson for yet another postponement and resorted to a different stratagem. For the first time, he alleged that his court-appointed attorney was incompetent and requested that he be dismissed. In questioning this eleventh-hour request, made for the first time when the case was ready to proceed on May 20, Judge Sklar inquired as to why the claim of incompetency based upon the jury selection of March 30 had not been raised when the appellant was before the court on April 26. The appellant's response again smacks more of the guileful than of the genuine:

"THE COURT: You were back here in court again on April 26th?
MR. JONES: Yes.

> THE COURT: When you asked for another postponement to try to get a witness you said you wanted to get.
>
> MR. JONES: Wasn't able to contact the witness.
>
> THE COURT: Then you didn't say anything about Mr. Nelson being incompetent.
>
> MR. JONES: No, I didn't say anything at that time because I had to give it plenty thought first."

The appellant's charge against his court-appointed attorney was that the attorney did not adequately caution him against the profligate use of his peremptory challenges. He did acknowledge his own active participation in the selection process, pinning the ostensible dereliction upon, "[t]he fact when I was picking the jury he seemed to be negligent. He didn't make me aware of the procedure I had to go through. I used up my twenty strikes and wasn't aware I had twenty strikes."

After the dismissal of the attorney had been permitted, largely because of the appellant's assurances that he was going to get his own privately-retained lawyer, Mr. Nelson put upon the record his consistent advice to the appellant to husband his peremptories more carefully:

> "MR. NELSON: In reference to what Mr. Jones just said about not advising him of his strikes at the time we were selecting the jury, I did advise. I want the record to indicate I did tell Mr. Jones he had twenty strikes, now don't use them all up at the time. Maybe Mr. Jones did not understand what I had said at the time and we proceeded to use those challenges rather freely. Also, I want to indicate for the record I advised him in the middle of using these twenty strikes, we have, Mr. Jones, we only have a few more. I think I said 'You have about

half of your strikes already gone. Take it easy.' Maybe he didn't understand but I did advise him he had twenty strikes.

THE COURT: Are you saying Mr. Jones was exercising his own discretion in making strikes and not you?

MR. NELSON: I'm saying that exactly. And if you recall, Mr. Jones was the one telling me who to challenge.

THE COURT: The Court did note Mr. Jones was telling you whether to challenge or not challenge prospective jurors. Both of you were in animated discussion on each and every prospective juror.

MR. NELSON: I would want the record to indicate I had advised Mr. Jones of this, not only prior to jury selection but even at the time we were selecting a jury."

I find particularly troubling the holding of the majority opinion in this regard:

"Although an accused obviously cannot be permitted to change his election as a dilatory tactic, we note that here, from the complete record, there was at least a modicum of doubt that the accused fully understood the method by which a jury was selected at the time he participated with his counsel in selection of the jury."

It is only of secondary importance that I find no doubt whatsoever that this appellant knew full well what he was doing at every stage of the proceedings. Of primary importance is my inability to accept "a modicum of doubt" as an adequate standard for determining that a trial judge "abused his discretion" in finding otherwise, where that finding was based upon fact and legitimate inference, notwithstanding "a modicum of doubt."

The appellant gave Judge Sklar reason to believe that he would retain his own attorney:

"THE COURT: Do you have any money or funds to get your own lawyer?

MR. JONES: My mother probably help me.

THE COURT: Has she been in touch with you?

MR. JONES: Yes.

THE COURT: Did she say anything to you about getting you a lawyer?

MR. JONES: I told her what I was going to do. She told me after I find out if I can dismiss this lawyer or not we will make other arrangements."

Based upon the desire not to place Mr. Nelson in the awkward position of having to stay on the case in view of the appellant's disposition toward him and upon the assurances that the appellant would retain his own counsel, Judge Sklar permitted Mr. Nelson to withdraw his appearance. The court said:

"THE COURT: I always find it better for the client and for the State also if a man gets his own lawyer. He feels better about it, but you have to pay for it. Understand?

MR. JONES: Yes."

The court then inquired of the appellant as to how long a delay he wished in order to retain counsel. I find the response significant:

"THE COURT: How much time do you want?

MR. JONES: I would like to request a couple months.

THE COURT: That is too long.

MR. JONES: As far as getting a lawyer, familiarizing the case and how I want to defend myself, that will take a couple months.

THE COURT: That is very unusual. It is usually the other way around where the defendant wants to get his trial up as soon as possible.

MR. JONES: This is a different situation, though."

Judge Sklar scheduled the appellant for rearraignment on June 10. There is no record of any proceeding on that date. The appellant did not obtain his own attorney and on June 30, 1971, Judge Paul A. Dorf appointed Irving Settleman, Esq., as counsel for the appellant. Mr. Settleman filed his appearance on July 15, 1971. In the meantime, the summer recess was upon the Criminal Court of Baltimore, followed by the rotation of Judge Sklar out of and Judge Liss into the Criminal Court.

It is against this backdrop of chronology that the appellant's request before Judge Liss to withdraw his waiver of a jury trial must be viewed. Against this backdrop, I find unpersuasive the reasoning of the majority opinion:

"We think it of significance that several months had elapsed since the accused had made his election for a court trial, that a different judge was presiding at the trial than at the time the original election was made and that different trial counsel had been provided in the interim."

In my judgment, the majority opinion aptly summarizes our prior law upon the subject:

"Our cases, *Staten v. State,* 13 Md. App. 425, 283 A. 2d 644; *Cole v. State,* 12 Md. App. 379, 277 A. 2d 248 and *Walter v. State,* 4 Md. App. 373, 243 A. 2d 626, hold that for good cause a previous election may be withdrawn up until the actual commencement of the trial unless there is a showing that the granting of the motion would unduly delay the trial *or otherwise impede justice.*" (Emphasis supplied)

Our difference is in the application of that law to the present case. They point out that a jury was immediately available on December 6. I find this an irrelevant factor because Judge Liss's decision was not based upon the

"undue delay of trial" aspect of the disjunctive proviso but rather upon the alternative ground that the requested action would "otherwise impede justice." Judge Liss sensed immediately what the appellant was up to:

"THE COURT: He assisted in the selection of the jury with his counsel at that time?

MR. SETTLEMAN: As far as I know he did.

THE COURT: Then he took a look at the jury, he wasn't happy with them, so he decided he wanted a Court trial."

Judge Liss recognized the change in election and the request for delay as combined thrusts of a common strategy:

". . . after the jury was selected, before it was sworn, the defendant changed his mind and said that he wanted to have a trial by a Court. At that time also he asked for a postponement allegedly to secure additional witnesses. It seems to me, I have Judge Sklar's conversation with this defendant at that time, and Judge Sklar made it perfectly clear to him what a jury trial was and asked whether or not he wanted to waive the jury trial and he said he did. And I don't think at this point, having gotten what he wanted apparently, which was a postponement and a delay, he can now come in and say I have changed my mind again."

The clear import of Judge Liss's ruling is that to permit a defendant, no matter how convoluted and drawn out his path to his objective, to get rid of one jury he doesn't like and then to pick another in its stead would be, *ipso facto*, to "impede justice." Nor do I think that the appellant met his initial burden of showing "good cause" why the "previous election [should] be withdrawn," which would seem from our former cases to be a prerequisite requirement even before the limiting provisos came into play.

The majority opinion relies in part upon a misunderstanding before Judge Liss as to whether the appellant had or had not given Judge Sklar his reasons for wishing to change his election from jury trial to court trial. Judge Liss was apparently reading from the proceedings of April 5. The claim as to incompetence of counsel on the use of peremptory challenges had come out at the tail end of the proceedings of March 30. In any event, it is clear that Judge Liss was not relying on any such factor:

> ". . . it really doesn't make any difference whether you said that to Judge Sklar or not because you got everything to which you were entitled at the time of the hearing. The fact you didn't know your strikes were limited certainly didn't make any difference because you availed yourself of everything that was entitled to.
>
> MR. JONES: My lawyer didn't make me aware of it. He's supposed to.
>
> THE COURT: Suppose he didn't make you aware of it, could you have had any more strikes?
>
> MR. JONES: I could have helped myself more.
>
> THE COURT: How?
>
> MR. JONES: I would not have used the strikes foolishly by not being aware of it.
>
> THE COURT: I'm sorry, sir, I don't think that makes any difference in this case. There's no showing that you used them as you say foolishly. What was it, robbery case?
>
> MR. SETTLEMAN: Yes, sir.
>
> THE COURT: You have 20 strikes. That means you struck 20 people off that jury panel. I can't imagine how you could possibly strike 20 people off a jury panel foolishly. If you elected to strike them off, that's it. Certainly I can't believe that you expected you could con-

tinue to strike indefinitely and continue until you had gotten God knows how many.

MR. JONES: The impression I was under, I was under the impression I could pick the jury of my choice. I didn't know nothing about it.

THE COURT: If what you say is true, you could have continued and never had a jury, isn't that right?

MR. JONES: I could have continued?

THE COURT: Yes. In other words every time you got twelve people you could continue to strike and you'd never get twelve people that satisfied you.

MR. JONES: I would have got twelve people of my choice.

THE COURT: All right. Mr. Jones I think you have had twelve people of your choice. You waived your right to a jury trial and I'm ready now to proceed with this trial. All right."

On December 22, 1971, sixteen days later, the same issue was before Judge Liss again in a hearing upon the appellant's Motion for a New Trial. Judge Liss there amplified the reasons for his earlier decision:

"Now it would certainly seem to me, as I understand it, the reason Mr. Jones made the decision to change a request for a jury trial was that he took a look at the jury after they had been selected, he wasn't happy with them and decided he didn't want to be tried by that jury. It seems to me that this is part of the tactics on the part of Mr. Jones. I have no assurance if he selected another jury he wouldn't have changed his mind then and if I am to believe that, this is a right which a defendant has, a defendant can vary and vacillate between Tweedle Dum and Tweedle Dee and never try a case or try it only when he gets what he thinks

is satisfactory. I may be wrong, and if I am I'm sure the Court of Special Appeals will so advise me. But it seems to me that where this man was given his right to a jury trial, where he participated in the selection of a jury, and immediately before the jury was sworn he changed his mind and decided he wanted to be tried by the Court and he was advised at that time that he was waiving any right that he had to a jury trial and that the case would be tried by a Court, that then to say now I have changed my mind again and say I want a jury is not part of his rights. It seems to me that any such tactics on the part of the defendant is an obstruction of the administration of justice and the fact that a jury was available for selection doesn't prove anything because I have no assurance that he would ever have been satisfied with any jury that was selected. I think that he made a waiver, I think that he made it with full knowledge of the facts. He indicated that at that time in April of 1971 that he not only was satisfied with the waiver but he understood it and under those circumstances I don't think that he had a right to change his mind again."

This was certainly a reasoned judgment. It certainly had arguable support in fact and permissible inference. It was neither arbitrary, whimsical, capricious nor malicious. I cannot conceive of how Judge Liss could have ruled otherwise.

I see in this case a frightening demonstration of how over-solicitude can permit criminal dockets to become jammed almost beyond hope of redemption and can permit interminable stops and starts to corrode the very face of justice. I see a Svengali-like appellant who has manipulated shockingly the courts and his attorneys alike. I see a resolute judge who finally called a halt. I

applaud. Needless to say, there is subsumed in that greater approbation the firm belief that Judge Liss, at the very least, did not abuse his discretion. I would affirm.